**COLORADO DEPARTMENT OF SOCIAL SERVICES, Petitioner,**

v.

**The DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., Respondents.**

**Civ. A. No. 82–M–281.**

United States District Court, D. Colorado.

Jan. 25, 1983.

Kenneth S. Lieb, Asst. Atty. Gen., Human Resources Section, Denver, Colo., for petitioner.

Margaret Jane Porter, Washington, D.C., Janis E. Chapman, Asst. U.S. Atty., Denver, Colo., for respondents.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

The State of Colorado Department of Social Services (Colorado) brought this action to obtain judicial review of two decisions by the Board of Grant Appeals (the Board) of the United States Department of Health and Human Services (HHS). The Board upheld the disallowance by the Secretary of HHS (the Secretary) of certain federal funding of Colorado's state plan of medical assistance under the Medicaid Act. Two disallowances are involved: $2,881,309, for the period from January 1, 1978 through June 30, 1978; and $21,377, for a one-day infraction which occurred on January 27, 1978.

This court's jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1361, and under 5 U.S.C. § 702. Section 702 does not confer subject matter jurisdiction on district courts; it simply provides for judicial review of final agency action where there is an independent basis for subject matter jurisdiction. *Califano v. Sanders,* 430 U.S. 99, 104–07, 97 S.Ct. 980, 983–985, 51 L.Ed.2d 192 (1977). In this case the defendants concede that judicial review under the Administrative Procedure Act, pursuant to the court's federal question jurisdiction under 28 U.S.C. § 1331, is proper.

The defendants filed a motion to affirm the Secretary's decisions on the record. The court has the administrative record for each of the Secretary's disallowance decisions, the defendants' motion has been briefed and argued fully, and the case is ready for final disposition.

The history of the disallowances at issue in this lawsuit, particularly the larger disallowance, is long and complicated, due to the complexity of the Medicaid statute, the relevant provisions of which were amended twice, each time with significant impact on Colorado.

Title XIX of the Social Security Act, commonly known as the Medicaid Act and codified at 42 U.S.C. §§ 1396–1396n, provides funding to enable each state to furnish "necessary medical services" for families with certain dependent children and for aged, blind, or disabled individuals "whose income and resources are insufficient to meet the costs" of those services. 42 U.S.C. § 1396. The payments are made to those states which have submitted, and had approved by the Secretary, state plans for medical assistance meeting all of the requirements set forth in 42 U.S.C. § 1396a(a). Colorado submitted and obtained approval of its plan and thereby became entitled to quarterly payments from appropriated federal funds as reimbursement for prescribed portions of the expenditures made for medical assistance to eligible recipients and certain administrative costs.

The formulae for computing federal payments to the states are established in 42 U.S.C. § 1396b. The sharp focus in this case is on § 1396b(g) and the amendments

**340**

to it.* That section requires a decrease in the federal medical assistance percentage of payments for inpatient care in hospitals, mental hospitals (MHs), skilled nursing facilities (SNFs), and intermediate care facilities (ICFs) after certain time periods, unless the state "makes a showing satisfactory to the Secretary that, with respect to each calendar quarter for which the State submits a request for payment ... there is in operation in the State an effective program of control over utilization of such services ..."

Section 1396b(g)(1) further sets out specific matters which must be included in such a showing. The following two requirements are particularly pertinent in this action:

> (g)(1) ... [S]uch a showing must include evidence that—
>
> (A) in each case for which payment is made under the State plan, a physician certifies at the time of admission, or, if later, the time the individual applies for medical assistance under the State plan ... that such services are or were required to be given on an inpatient basis because the individual needs or needed such services; and
>
> .    .    .    .    .
>
> (D) such State has an effective program of medical review of the care of patients in mental hospitals, skilled nursing facilities, and intermediate care facilities pursuant to section 1902(a)(26) and (31) [42 U.S.C. §§ 1396a(a)(26), (31)] whereby the professional management of each case is reviewed and evaluated at least annually by independent professional review teams.

42 U.S.C. §§ 1396b(g)(1)(A), (D).

The smaller disallowance resulted from a determination that Colorado failed to meet the physician certification requirement in § 1396b(g)(1)(A). The larger disallowance resulted from a determination that Colorado failed to meet the requirement of § 1396b(g)(1)(D) for independent profes-

sional review (IPR) and medical review (MR) during the first two calendar quarters of 1978.

The reviews requirement of § 1396b (g)(1)(D) must be considered in the context of other provisions of the Medicaid Act. Section 1396a(a)(26) and its implementing regulations at 42 C.F.R. Part 456, Subpart I (1981), outline the requirements of a program of medical review in SNFs and MHs; § 1396a(a)(31) and the same implementing regulations outline the requirements of a program of independent professional review in ICFs. While §§ 1396a (a)(26) and (31) require that state plans provide for "regular programs" of MR and IPR, including "periodic" on-site inspections of facilities, the showing mandated by § 1396b(g)(1)(D) requires that such inspections of MRs and IPRs must be performed "at least annually" in order to avoid the decrease in percentage payments.

Section 1396b provides for quarterly payments to the states under the Medicaid Act, and § 1396b(g) incorporates that format by requiring the state to show that it has an effective program of utilization control for each quarter for which it seeks federal funding. The state must submit its quarterly utilization control showings within thirty days after the end of the quarter with respect to which the showings are made. 42 U.S.C. § 1396b(g)(4)(A).

HHS, acting through the Health Care Financing Administration (HCFA), developed specific procedures for the states to follow when making their quarterly showings. Each quarter the state must submit certifications signed by the director of the state Medicaid agency, stipulating that for each level of care there were methods and procedures in effect to assure that utilization control requirements were met during that quarter. 42 C.F.R. § 456.654(a)(1) (1981). Additionally, the state must submit lists of all MHs, SNFs and ICFs participating in the state Medicaid program for that quarter, and must indicate for each facility the dates on which required reviews were completed and the name and degree of one

---

* For convenience, the full text of that section is reprinted in the Appendix to this opinion.

professional member of the review team for each review completed. *Id.* §§ 456.-654(a)(2), (5) and (7). Finally, the state must submit, in addition to the facility listings described above, lists of all MHs, SNFs and ICFs participating in the state Medicaid program for that quarter which did *not* receive an appropriate review during the annual period ending on the last day of the quarter in question. *Id.* § 456.654(a)(6).

The state's quarterly utilization control showings are reviewed by HCFA to determine whether they are satisfactory on their face. The Secretary shall find a state's showing "satisfactory" with respect to 42 U.S.C. § 1396b(g)(1)(D), if the showing demonstrates that the state has conducted the required onsite inspections during the 12-month period ending on the last day of the calendar quarter, by a medical review team visit to each SNF and MH that participated in the state's Medicaid program for the showing quarter, and by an independent professional review team visit to each participating ICF.[1] An unsatisfactory showing requires a reduction in the federal medical assistance percentage payment according to the formula set out in § 1396b(g)(5).

Section 1396b(g)(2) requires the Secretary, as part of his validation procedures, to conduct sample onsite surveys of institutions in which persons receive care under the state plan. In those surveys the Secretary should obtain information which supports the representations made in the state's showings. If HCFA is unable to validate the state's showing of utilization control for a particular calendar quarter, it must find the showing invalid and reduce payments by a computation made pursuant to § 1396b(g)(5).

The effective date of the statutory requirements for utilization control codified in 42 U.S.C. § 1396b(g) was July 1, 1973. Social Security Amendments of 1972, Pub. L.No. 92–603, § 207(b), 86 Stat. 1329 (1972). Apparently, these new requirements were not immediately enforced. By letter dated September 24, 1976, HHS informed Colorado that the Department was conducting a survey and could not validate the state's adherence to the MR requirements in SNFs during fiscal year 1975. In that letter HHS said:

> The RO [Regional Office] reviewers were informed by the Colorado Department of Social Services that the MR reports were on file at the Colorado State Health Department. On-site validation visits were made to the Colorado State Health Department on July 26, 27, and 28, 1976. On these occasions, in response to a request by the RO staff for the MR reports, staff of the State Health Department produced form SSA–1569, entitled "Medicare/Medicaid Skilled Nursing Facility Survey Report." RO staff have also been informed that the "MR report" form for participating MHs is form SSA–1537–A, entitled "Psychiatric Hospital Survey Report."
>
> Forms SSA–1569 and SSA–1537–A, developed and issued by the Social Security Administration, are *facility-oriented* rather than *patient-oriented*. They are designed exclusively to evaluate and record whether the facility complies (or continues to comply) with the conditions of participation of a provider of health care services in either title XVIII (Medicare) or title XIX (Medicaid). These forms do not call for any information regarding medical review of individual patients, or for inspection of patient medical records, except on a sample basis.

---

1. Section 1396b(g)(4)(B) provides that a state's showing with respect to the requirement of annual onsite inspections of MHs, SNFs, and ICFs, pursuant to §§ 1396a(a)(26) and (31), will be "satisfactory" if the showing demonstrates that the state has conducted an inspection during the annual period ending on the last date of the calendar quarter "in each of not less than 98 per centum of the number of hospitals and facilities requiring such inspection, and in every such hospital or facility which has 200 or more beds," and that with respect to the uninspected facilities, "the State has exercised good faith and due diligence in attempting to conduct such inspection . . ." Colorado does not suggest that this exception for minor deviations from compliance with the annual review requirement under § 1396b(g)(1)(D) is applicable to the disallowances at issue in this litigation.

... As a result, RO staff were [sic] not able to identify the SSA–1569 as a MR report, and therefore was unable to validate that MR was performed by Colorado in SNFs during FY '75.[2]

HHS requested Colorado to send the information necessary to validate the state's compliance with the MR requirement, and informed the state that "[a] substantial penalty may be assessed against Federal financial participation in Colorado's title XIX program if SRS [predecessor to HCFA] is unable to validate that MR was performed by Colorado in FY '75 in accordance with UC requirements."[3] Public Law 95–142, enacted on October 25, 1977 and discussed at length *infra,* eventually forgave all reductions otherwise required for unsatisfactory or invalid showings for quarters beginning before January 1, 1977, and therefore HHS took no reductions for fiscal year 1975. 42 U.S.C. § 1396b(g)(3)(A)(i).

In early June 1977, Colorado received notice by mail from HHS that the state's July 1, 1977 quarterly payment would be reduced by $2,295,397, because the showing for the first quarter of 1977 indicated an inadequate utilization control program. Specifically, the designated state agency "did not conduct the required annual review of all long-term care facilities."[4] Because HHS determined that Colorado's showing for that quarter was unsatisfactory on its face, it did not perform a validation survey.

HHS subsequently notified Colorado by letter dated September 1977 that the state's showing for the second calendar quarter of 1977 also was inadequate, again due to the state's failure to make a satisfactory showing that it had complied with the annual review requirement of 42 U.S.C. § 1396b(g)(1)(D).[5] During December 1977, HHS notified Colorado that a preliminary review of the state's showing for the third calendar quarter of 1977 indicated that it too was inadequate, due to an unsatisfactory showing of compliance with the annual review requirement.[6]

Colorado was one of twenty states whose payments were to be reduced due to unsatisfactory showings of utilization control programs during the first three quarters of 1977.[7] In response to this situation, Congress enacted Public Law 95–142, on October 25, 1977, significantly amending 42 U.S.C. § 1396b(g). The amendment unconditionally waived any reduction otherwise required because of an unsatisfactory or invalid showing for any quarter prior to January 1, 1977. Act of Oct. 25, 1977, Pub. L.No. 95–142, § 20, 91 Stat. 1175. It conditionally waived reductions otherwise required due to unsatisfactory or invalid showings for quarters ending on March 31, June 30, and September 30, 1977. *Id.* As explained above, HHS had assessed disallowances against Colorado for each of these calendar quarters, and therefore, the operation of the conditional waiver provision was critical to the state. That provision, as set out below, was codified at 42 U.S.C. § 1396b(g)(3)(B), until it was replaced in 1980 by an even more forgiving conditional waiver provision, as discussed *infra:*

The Secretary shall waive application of any reduction in the Federal medical assistance percentage of a State otherwise required to be imposed under paragraph (1) because a showing by the State, made under such paragraph with respect to a calendar quarter ending after January 1, 1977, and before October 1, 1977, is

2. Letter from James R. Burress, Regional Commissioner HHS, to Dr. Henry A. Foley, Executive Director Colorado Department of Social Services (Sept. 24, 1976) (emphasis in original). (Record, app. A, tab I, exh. 13).

3. *Id.*

4. Letter from Robert A. Derzon, HHS Administrator, to Dr. Henry A. Foley (June 8, 1977). (Record, app. A, tab I, exh. 16).

5. Letter from Robert A. Derzon to Dr. Henry A. Foley (Sept. 1977). (Record, app. A, tab I, exh. 17).

6. Letter from Paul Willging, Acting Director Medicaid Bureau HCFA, to Garry A. Toerber, Colorado Department of Social Services (Dec. 12, 1977). (Record, app. A, tab I, exh. 18).

7. *See* Letter from Robert A. Derzon to Dr. Henry A. Foley (Sept. 1977). (Record, app. A, tab I, exh. 17 at 2).

determined to be either unsatisfactory under such paragraph or invalid under paragraph (2), if the Secretary determines that the State's showing made under paragraph (1) with respect to the calendar quarter ending on December 31, 1977, is satisfactory under such paragraph and is valid under paragraph (2). *Id.* In plain language, this permitted states to avoid reductions for the first three quarters of 1977 by making a "satisfactory" and "valid" showing of utilization control for the final calendar quarter of 1977.

HHS notified the states, including Colorado, by a mailgram dated October 18, 1977, and by an agency Action Transmittal (AT) dated November 11, 1977, HCFA–AT–77–106, of the changes effected by Public Law 95–142. The mailgram summarized the new conditional waiver provision as follows:

> It requires the Secretary to waive any reductions for calendar year 1977 if he finds the showing for the quarter ending December 31, 1977 both satisfactory and valid. For this quarter states must review all facilities whose annual review date falls in this quarter plus all facilities which were not reviewed in the previous 3 quarters.[8]

The AT summarized the conditional waiver provision as follows:

> P.L. 95–142:
>
> .    .    .    .    .    .
>
> —Requires the Secretary to waive any reductions in Federal matching payments for failures to make satisfactory or valid showings with respect to the first three calendar quarters in calendar year 1977 IF HE FINDS THE SHOWINGS FOR THE QUARTER ENDING DECEMBER 31, 1977 BOTH SATISFACTORY AND VALID.
>
> States should note that the statute does not provide for waiver of reductions based on a prior quarter if the showing

for the quarter ending December 31, 1977 is found unsatisfactory or invalid, even if all the reviews omitted in a prior quarter are made up by December 31, 1977. . . . [9]

Colorado submitted a facially satisfactory showing for the quarter ending on December 31, 1977, with respect to the annual MR and IPR components of its utilization control program. That showing indicated that Colorado had performed during the year ending on December 31, 1977, at least one MR or IPR which met the requirements of 42 U.S.C. §§ 1396a(a)(26) and (31) in every facility which was participating in the state Medicaid program during the calendar quarter ending on December 31, 1977.

Pursuant to the validation procedures required under 42 U.S.C. § 1396b(g)(2), HHS conducted sample onsite surveys to determine whether the facially satisfactory showing for the fourth calendar quarter of 1977 actually met the specific requirements set out in §§ 1396a(a)(26) and (31), and incorporated by § 1396b(g)(1)(D) into the utilization control program. In AT 78–15, dated February 15, 1978, HHS explained to the states how it would conduct its validation survey:

> The validation survey will be conducted during the period February 21, 1978 through April 30, 1978.
>
> .    .    .    .    .    .
>
> During the validation survey, Regional staff will attempt to verify that every facility which had a continuous provider agreement for a twelve month period (at one or more levels of care) as of any date in the quarter ending December 31, 1977 received an appropriate MR or IPR review during the twelve month period ending December 31, 1977.[10]

Colorado concedes that it received this AT.

The validation survey failed to substantiate Colorado's facially satisfactory showing.

---

**8.** Mailgram from M. Keith Weikel, Acting Director Medicaid Bureau HCFA, to Colorado (Oct. 18, 1977). (Record, app. A, tab I, exh. 6).

**9.** HCFA–AT–77–106 (Nov. 11, 1977) (emphasis in original) (footnote omitted). (Record, app. A, tab I, exh. 7 at 12–13).

**10.** HCFA–AT–78–15 (Feb. 15, 1978). (Record, app. A, tab I, exh. 8).

Specifically, HHS determined that reviews performed prior to October 1, 1977 were inadequate under §§ 1396a(a)(26) and (31), because they were facility-oriented rather than patient-oriented. The methodology and results of the validation survey are best explained by quoting from the official disallowance letter which HHS sent to Colorado on January 22, 1979:

The validation survey for the quarter ending December 31, 1977, focused on the requirement of annual medical and independent professional review (MR and IPR) in mental hospitals (MHs), skilled nursing facilities (SNFs), and intermediate care facilities (ICFs). Section 1903(g)(1)(D) requires that each State have an effective program of MR and IPR of the care of recipients in MHs, SNFs, and ICFs, pursuant to section 1902(a)(26) and (31) of the Act, "whereby the professional management of each case is reviewed and evaluated at least annually." Regulations implementing section 1902(a)(26) and (31) require that inspections by review teams must include personal contact with and observation of each Medicaid recipient in the facility, and review of each such recipient's record, except that the inspection in an institution for mental diseases caring for mental patients 65 or older may, in certain circumstances, be limited to the review of each recipient's record. The regulations require that a full and complete report on each inspection visit be promptly submitted by the MR or IPR team to the State Medicaid agency, "covering the observations, conclusions, and recommendations of the team," and including specific findings with respect to individual recipients.

During the validation survey, our regional office staff conducted onsite visits at the Colorado Department of Health on March 13, 1978, to validate that required annual reviews had been performed on the dates provided in the State's showing by examining the MR and IPR reports submitted by the review teams. When asked by the regional office staff for the review reports corresponding to the 1977 review dates listed by your State on your 12/31/77 showing, staff of the Department of Health presented several forms, including form SSA–1569, entitled "Medicare/Medicaid Skilled Nursing Facility Survey Report;" form SSA–3070(D)— "Additional General Intermediate Care Facility Standards to be Used with the Survey Report Form for Hospitals/Skilled Nursing Facilities;" form SSA–1538—"Hospital Survey Report;" and form SSA–3070—"General Intermediate Care Facility Survey Report."

While MR and IPR reports do not have to be on any particular form, they do have to show that medical and independent professional review were performed. These SSA forms which the State staff presented are facility-oriented, rather than patient-oriented. They are designed to evaluate and record whether the facility complies with the conditions of participation in Medicare and Medicaid. These forms do not meet the regulatory requirements that the report for MR, provide "specific findings with respect to individual patients," and for IPR, "specific findings with respect to individuals." Moreover, these forms provide no evidence that each individual recipient and/or his or her record were reviewed, or that medical and independent professional reviews meeting Federal requirements were performed.

For every facility for which your State's showing for the quarter ending December 31, 1977, indicated a review date during the first three calendar quarters of 1977, the SSA form presented as the review report for that facility indicated the same review date. Regional staff were not provided with any other reports that contained specific findings on individual recipients, or that gave other evidence that adequate reviews were performed. As a result, my staff were not able to identify any of these SSA forms as MR or IPR reports, and I was therefore unable to validate that reviews meeting Federal requirements were performed by your State during the first

three calendar quarters of 1977. Reports presented by State staff for reviews performed after October 1, 1977, indicated that your State had begun a new review process to meet Federal requirements, and based on those reports, we were able to validate your 12/31/77 showing with respect to those reviews.[11]

On October 1, 1977, Colorado began using a new inspection and reporting procedure for the required reviews. In the official notice of disallowance, HHS concluded that the reviews done after October 1, 1977 did meet the requirements of 42 U.S.C. § 1396a(a)(26) and (31), incorporated into the utilization control requirement of § 1396b(g)(1)(D). However, HHS interpreted that section to require each quarterly showing to indicate that an adequate review had been performed during the previous twelve months in every facility participating in the state's Medicaid program during the showing quarter. Accordingly, HHS concluded that Colorado's unsatisfactory showings for the first three quarters of 1977 rendered invalid the state's showing for the last quarter of that year, notwithstanding that all reviews performed during that quarter complied with the specific requirements of §§ 1396a(a)(26) and (31). Once the Secretary determined that Colorado's showing for the fourth calendar quarter of 1977 was invalid, he could not use the conditional waiver provision to waive reductions previously assessed against the state

for the first three quarters of the year. In addition, he concluded that the inadequate reviews made before October 1, 1977, rendered invalid Colorado's showings for the quarters ending on March 31 and June 30, 1978, because for some facilities caring for Medicaid recipients during those quarters, the most recent reviews were those performed before October 1, 1977.

Based on these determinations, the Secretary ordered reductions for the four quarters of 1977 and the first two quarters of 1978. By letter dated December 29, 1978, the Secretary notified the Governor of Colorado that the reduction would be in the amount of $11,015,392.[12] The Secretary issued the official notice of disallowance on January 22, 1979, by letter to Armando R. Atencio, Executive Director of the Colorado Department of Social Services; at that time, based on HHS's corrected calculations, the previously estimated penalty was reduced to $10,909,718.[13]

On December 5, 1980, Congress enacted the Omnibus Reconciliation Act of 1980. Pub.L.No. 96–499, 94 Stat. 2599. Section 964 of that public law amended the conditional waiver provision in 42 U.S.C. § 1396b(g)(3)(B), and its legislative history indicates that it was included in response to Colorado's plight.[14] As amended, the conditional waiver provision directed the Secretary to waive any reductions otherwise required to be imposed for 1977 calendar

---

11. Official notice of disallowance from Leonard D. Schaeffer, HCFA Administrator, to Armando R. Atencio, Executive Director Colorado Department of Social Services (Jan. 22, 1979) (footnote and citations omitted). (Record, app. A, tab I, exh. 2 at 3–5).

12. Letter from Joseph A. Califano, Jr., Secretary HHS, to Governor Richard Lamm (Dec. 29, 1978). (Record, app. A, tab I, exh. 1).

13. Letter from Leonard D. Schaeffer, Administrator HCFA, to Armando R. Atencio (Jan. 22, 1979). (Record, app. A, tab I, exh. 2).

14. The House Report explains the conditional waiver amendment as follows:

> For technical reasons, *the State of Colorado is, under current law, still subject to retroactive penalties.* Since the Committee believes the State has complied with the spirit

of Public Law 95–142 [enacting the original conditional waiver provision], the section would direct the Secretary to waive any financial penalty assessed against a State with respect to periods before January 1, 1978, if the State is able to show to the Secretary's satisfaction that it was in compliance on or before December 31, 1978. The Committee emphasizes that this technical change is in no way to be viewed as a retrenchment or a lack of resolve on its commitment to effective utilization control and medical audit programs under medicaid. It fully expects and intends that *Colorado* and all other States participating in medicaid will take the necessary steps to remain in full compliance.
> H.R.Rep. No. 1167, 96th Cong., 2d Sess. 89–90, *reprinted in* [1980] *U.S.Code Cong. & Ad.News* 5526, 5603 (emphasis added).

quarters, if he determined that the state made a satisfactory and valid showing for any calendar quarter in 1978:

> (B) The Secretary shall waive application of any reduction in the Federal medical assistance percentage of a State otherwise required to be imposed under paragraph (1) because a showing by the State, made under such paragraph with respect to a calendar quarter ending after January 1, 1977, and before January 1, 1978, is determined to be either unsatisfactory under such paragraph or invalid under paragraph (2), if the Secretary determines that the State's showing made under paragraph (1) with respect to any calendar quarter ending on or before December 31, 1978, is satisfactory under such paragraph and is valid under paragraph (2).

42 U.S.C. § 1396b(g)(3)(B).

Colorado's reviews made after October 1, 1977 met the requirements of §§ 1396a(a)(26) and (31), and its showings for the last two quarters of 1978 were both satisfactory and valid. In a Supplemental Memorandum to the Board of Grant Appeals, which was considering Colorado's application for review of the disallowance, HCFA acknowledged that the reduction assessed for the four 1977 calendar quarters should be waived under the amended conditional waiver provision.[15] But, HCFA adhered to its position that the disallowance for the first two calendar quarters of 1978 is non-waivable, "because the waiver provision in section 1903(g)(3)(B) [42 U.S.C. § 1396b(g)(3)(B) ] is not applicable to these quarters, and Petitioner [Colorado] failed to make satisfactory and valid showings for them."[16] Accordingly, the disallowance

was amended to reduce it from $10,909,718 (the sum of the reductions for the four quarters of 1977 and the first two quarters of 1978) to $2,881,309 (the sum of the reductions for the first two quarters of 1978 only).[17]

The Board of Grant Appeals agreed with the HCFA interpretation of the requirements of 42 U.S.C. § 1396b(g), including the amended conditional waiver provision, and it upheld the disallowance assessed for the first two calendar quarters of 1978. This civil action was then filed.

The smaller disallowance has a much shorter history. On April 17, 1978, HHS announced that it would perform validation surveys in ten states, including Colorado, to substantiate that physician certification and plan of care requirements were met for recipients who were admitted to ICFs or authorized for Medicaid payment for ICF services during the quarter ending March 31, 1978.[18] Sampling techniques were used in this validation survey. First, there was the selection of the state with the greatest number of ICF beds for the mentally retarded in each of HHS' ten regions. In each of those ten states, the twenty ICFs with the greatest number of ICF certified beds were identified. In each of those twenty ICFs, the validation surveyors selected a sample of about twenty patients from the lists of admissions and authorizations submitted by the states in their showings under 42 U.S.C. §§ 1396b(g)(1)(A) and (B).[19]

In Colorado, the surveyors found that, for one recipient in one facility during the quarter ending on March 31, 1978, the phy-

---

**15.** Respondent's Supplemental Memorandum. (Record, app. A, tab F).

**16.** *Id.* at 5.

**17.** For the first two calendar quarters of 1978, reductions were assessed against each of the three levels of care subject to § 1396b(g)(1)(D), in the following amounts:

For the quarter ending 3/31/78:

| | | |
|---|---|---|
| MH services | : | $ 189,417 |
| SNF " | : | $ 441,605 |
| ICF " | : | $1,322,265 |

For the quarter ending 6/30/78:

| | | |
|---|---|---|
| MH services | : | $ 47,664 |
| SNF " | : | $ 196,281 |
| ICF " | : | $ 684,077 |

Official letter of disallowance from Leonard D. Schaeffer to Armando R. Atencio (Jan. 22, 1979). (Record, app. A, tab I, exh. 2).

**18.** HCFA–AT–78–37 (April 17, 1978). (Record, app. B, tab G, exh. B).

**19.** *Id.*

sician certification had not been completed until the day after admission to the facility. HHS concluded that the state had not complied fully with the physician certification requirement of 42 U.S.C. § 1396b(g)(1)(A) and that its showing of an effective program of utilization control for the quarter was therefore invalid. It reduced Colorado's percentage of federal funding pursuant to the formula set out in § 1396b(g)(5). Since this formula reduces federal funding on a per facility basis, rather than on a per patient basis, the entire facility was treated as out of compliance, and the sum of $21,377 was disallowed.

Colorado appealed this determination to the Board of Grant Appeals, which affirmed the disallowance. This action was then filed.

### Jurisdiction

■ Colorado contends that the Board of Grant Appeals lacked jurisdiction because the disallowance was actually a withholding of funds for plan noncompliance under 42 U.S.C. § 1396c.[20] The Board rejected this argument in its Ruling on Jurisdiction dated January 12, 1981.[21] This court agrees with the reasoning of the Board in its ruling, and concludes that the Board did have jurisdiction to review the larger disallowance.

The larger reduction in payments was the result of Colorado's failure to perform the inspections necessary under the utilization control requirements of 42 U.S.C. § 1396b(g). There is no contention that Colorado's plan failed to comply with the provisions of 42 U.S.C. § 1396a. The reductions were made because Colorado's reviews of long-term care facilities made before October 1, 1977, were inadequate under 42 U.S.C. §§ 1396a(a)(26) and (31), thereby rendering invalid the state's showings of utilization control for the calendar quarters ending on March 31 and June 30, 1978. That was not a failure in planning; it was a failure of performance.

The jurisdiction of the Board of Grant Appeals is based on regulations promulgated by HHS. 45 C.F.R. Part 16, Subpart C, entitled "Special Provisions Applicable to Reconsiderations of Disallowances," governs "the conduct of reconsiderations of disallowances arising under sections . . . 1903 . . . of the Social Security Act (42 U.S.C. . . . 1396b . . . )." 45 C.F.R. § 16.90 (1978).[22] This jurisdiction was given to the Board by "interim final amendment" dated March 6, 1978. 43 Fed.Reg. 9265 (1978). In its summary of those regulations HHS indicated that its intent was to vest in the Board jurisdiction over all disallowances made after March 6, 1978, that otherwise would have fallen under 45 C.F.R. § 201.14.

**20.** For a discussion of the principal differences between a finding of plan noncompliance under 42 U.S.C. § 1396c, and a disallowance determination, see *New Jersey v. Department of Health and Human Services,* 670 F.2d 1262, 1269–71 (3rd Cir.1981). The important difference for purposes of this case, as acknowledged by counsel for Colorado during oral argument, is in the standard which the Secretary must apply before reducing federal funding. Under 42 U.S.C. § 1396c, penalties should not be assessed unless in the administration of the plan "there is a failure to comply *substantially*" with any provision of 42 U.S.C. § 1396a. 42 U.S.C. § 1396c (emphasis added). But 42 U.S.C. § 1396b(g) mandates a reduction in the federal percentage of Medicaid funding whenever there is a failure, however insubstantial, to comply with the statutory requirements for a program of utilization control.

**21.** (Record, app. A, tab G).

**22.** 45 C.F.R. Part 16 was revised on August 31, 1981. 46 Fed.Reg. 43816–22 (1981). Although Subpart C was eliminated by that revision, Appendix A to the revised Part 16 makes it clear that the Board continues to have jurisdiction over reductions assessed under 42 U.S.C. § 1396b(g). That appendix, entitled "What Disputes the Board Reviews," states in pertinent part:

(a) The Board reviews the following types of final written decisions in disputes arising in HHS programs authorizing the award of mandatory grants:

(1) *Disallowances under Titles* I, IV, VI, X, XIV, XVI(AABD), *XIX,* and XX of the Social Security Act, *including penalty disallowances such as those under sections* 403(g) and *1903(g) of the Act* and fiscal disallowances based on quality control samples.

45 C.F.R. Part 16, App. A § B(a)(1) (emphasis added).

*Id.* Section 201.14 lists specific disallowances which it covers, including:

(4) Reduction of the medical assistance percentage paid to a State, under certain circumstances, for failure to have in operation an effective program of control over utilization of certain inpatient medical services (section 1903(g) of the Act) [42 U.S.C. § 1396b(g) ];

45 C.F.R. § 201.14(a)(4) (1981).

Thus, when read together, 45 C.F.R. § 60.90 (1978), 45 C.F.R. § 201.14(a)(4) (1981), and 43 Fed.Reg. 9265 (1978) establish the Board's jurisdiction to review the larger disallowance, which is clearly a "[r]eduction of the medical assistance percentage ... for failure to have in operation an effective program of control over utilization ..."

This court's jurisdiction to undertake judicial review of a final agency decision within the limitations of the Administrative Procedure Act (APA) arises under 28 U.S.C. § 1331. *Washington Dep't of Social and Health Services v. Schweiker,* No. 81–7414 (9th Cir. Sept. 29, 1981) (unpublished order of dismissal); *County of Alameda v. Weinberger,* 520 F.2d 344 (9th Cir.1975); *Georgia Dep't of Human Resources v. Califano,* 446 F.Supp. 404 (N.D.Ga.1977). *Contra, Texas Dep't of Public Welfare v. Califano,* 556 F.2d 326 (5th Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 78, 58 L.Ed.2d 108 (1978) (dictum).

### Review of the Larger Disallowance

Review of the larger disallowance requires an interpretation of the "annual review" requirement of 42 U.S.C. § 1396b(g)(1)(D) and the 1980 amendment to 42 U.S.C. § 1396b(g)(3). These are questions of law and can be considered *de novo.*

To be "satisfactory" under § 1396b(g)(1), a state's quarterly showing must include evidence that the state has an effective program of MR and IPR "whereby the professional management of each case is reviewed and evaluated *at least annually* by independent professional review teams." 42 U.S.C. § 1396b(g)(1)(D) (emphasis added).

Colorado contends that there is a distinction between a "satisfactory" quarterly showing and the "validity" of that showing. It argues that to be "satisfactory" a showing need only indicate that the required inspections were made—regardless of whether those inspections were valid—i.e., in compliance with the statute and regulations as to content. The plaintiff urges that a showing is "satisfactory" if the state has conducted an onsite inspection during the year ending on the last day of the calendar quarter, whereas the validity of those inspections is determined only on a quarterly basis through the validation process referred to in 42 U.S.C. § 1396b(g)(2). Accordingly, the validity of inspections can be challenged only for the quarter in which they are reported to have occurred. That asserted distinction is said to be controlling in considering the conditional waiver provision for the first three quarters of 1977, in P.L. 95–142. Thus, Colorado claims that under that amendment, all that was required to waive disallowances for the quarters before October 1, 1977 was to show that there had been annual onsite inspections and that those done in the last quarter were valid. Under that view, the validity of the 1977 inspections was irrelevant to the 1978 showing and the 1980 amendment (P.L. 96–499) was not necessary.

The defendant's position is that, in determining the validity of Colorado's showings of MR and IPR for the first two quarters of 1978,[23] HHS correctly considered the validi-

---

**23.** The showings for those calendar quarters are included in the administrative record at App. A, tab I, exh. 3 and 4. Included in those showings are certifications that, in each showing quarter, Colorado complied with all utilization control requirements, including annual MR and IPR under 42 U.S.C. § 1396b(g)(1)(D). A closer examination of those certifications reveals that the state's showing for the calendar quarter ending on March 31, 1978, may not have been even satisfactory. In that certification Armando R. Atencio, Executive Director of the Colorado Department of Social Services, represented to HHS that for the showing quarter there was in Colorado a program of MR and IPR "whereby the professional management of each case was reviewed and evaluated by a properly constituted independent professional

ty (i.e. quality) of the annual reviews shown for all the facilities participating in those quarters, including those reviews shown to have been made in 1977.

■ Colorado's contention was properly rejected by the Board. Sections 1396b(g)(1) and (2) are organic; the validation procedures mandated by § 1396b(g)(2) apply to the utilization control requirements set out in § 1396b(g)(1) in their entirety—including the annual review requirement. This conclusion follows from the plain language of § 1396b(g) as well as from common sense.

Section 1396b(g)(2) requires the Secretary to conduct onsite surveys as part of "his validation procedures under this subsection." The words "this subsection" refer to § 1396b(g), which is the entire utilization control provision. There is no language in § 1396b(g)(2) which suggests that Congress intended the mandatory validation procedures to apply to anything less than all of § 1396b(g), or that Congress meant to require less from the states for a showing of validity than it required for a showing of satisfactoriness. Most important, there is not any indication that Congress intended to limit the Secretary to validating only those reviews which the state listed as having been performed during the showing quarter.[24]

The Colorado argument distinguishing "satisfactoriness" and "validity" is a sophism. It is disingenuous to suggest that Congress' concern for ensuring the effective utilization of public funds appropriated for medical assistance would be met by requiring nothing more than a paper performance by the states. Surely, the required quarterly showings must be more than the hypocrisy which would be inherent in a system in

which the states could misrepresent their performance in a "catch me if you can" challenge to HHS. The public welfare would not benefit from a game of "hide and seek" between the state and federal officials.

Colorado contends that, even if all annual reviews must be shown to comply with utilization control requirements, that obligation was waived for the first two calendar quarters of 1978, by Public Law 96–499 on December 5, 1980, amending § 1396b(g)(3)(B). Alternatively, the state argues that by that amendment, Congress intended to absolve Colorado of any reduction for any failures to conduct inspections in 1977. HHS' position is that the conditional waiver provided for in Public Law 96–499 is on its face inapplicable to the calendar quarters at issue here, and that the legislative history fails to support Colorado's argument that Congress intended to absolve the state of all penalties.

Section 1396b(g)(3)(B), as amended, provides:

> The Secretary shall waive application of any reduction in the Federal medical assistance percentage of a State otherwise required to be imposed under paragraph (1) [42 U.S.C. § 1396b(g)(1)] because a showing by the State, made under such paragraph with respect to a calendar quarter ending after January 1, 1977, and before January 1, 1978, is determined to be either unsatisfactory under such paragraph or invalid under paragraph (2) [42 U.S.C. § 1396b(g)(2)], if the Secretary determines that the State's showing made under paragraph (1) with respect to any calendar quarter ending on or before December 31, 1978, is satisfactory under

---

review team ..." Conspicuously absent from this statement is any reference to such a review having been performed "at least annually," as required under § 1396b(g)(1)(D).

**24.** There is additional support for HHS' interpretation of § 1396b(g)(2) in § 1396b(g)(6), which requires the Secretary to submit to Congress a report on his determinations of satisfactoriness, validity and, if necessary, reductions imposed against the states. Section 1396b(g)(6)(B) provides:

(6) The Secretary shall submit to Congress ... a report on—

.    .    .    .    .

(B) his review (through onsite surveys and otherwise) under paragraph (2) [§ 1396b(g)(2)] of *the validity of showings previously submitted by a State;*
(emphasis added). This language makes it clear that the Secretary's duty is to validate *all* showings submitted under § 1396b(g)(1) as part of the state's paper compliance.

such paragraph and is valid under paragraph (2).

It is not disputed that Colorado has met the stated condition of a satisfactory and valid showing for any 1978 calendar quarter; its showings for the quarters ending on September 30 and December 31, 1978 were both satisfactory and valid.

The dispute concerns the effect of meeting the condition, specifically for which calendar quarters reductions may be waived. It is clear from the statute, and the parties agree, that reductions otherwise required to be imposed for the four calendar quarters of 1977 are waived under the section.[25] But Colorado contends that the language "with respect to a calendar quarter ending after January 1, 1977, and before January 1, 1978" encompasses showings for calendar quarters falling after January 1, 1978, whenever such showings are deemed unsatisfactory or invalid due to noncompliance with § 1396b(g)(1)(D) in calendar quarters "after January 1, 1977, and before January 1, 1978." Accordingly, it is said that under this interpretation, the Secretary must waive the reductions for the first two calendar quarters of 1978, because they were based on Colorado's inadequate inspections made during 1977.

The words "with respect to" in § 1396b(g)(3)(B) are ambiguous. The legislative history of the 1980 amendment must be considered in determining the legislative intent concerning the scope of this remedial measure. *United States v. Donruss Co.,* 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969). This provision was one of many Medicaid Act amendments contained in the Omnibus Reconciliation Act of 1980, Pub.L.No. 96–499, 94 Stat. 2599 (1980). The House Report contains the following explanation:

> For technical reasons, the State of Colorado is, under current law, still subject to retroactive penalties. Since the Committee believes the State has complied with the spirit of Public Law 95–142 [the original conditional waiver provision], the section would direct the Secretary to waive any financial penalty assessed against a State *with respect to periods before January 1, 1978,* if the State is able to show to the Secretary's satisfaction that it was in compliance on or before December 31, 1978. *The Committee emphasizes that this technical change is in no way to be viewed as a retrenchment or a lack of resolve on its commitment to effective utilization control and medical audit programs under medicaid.* It fully expects and intends that Colorado and all other States participating in medicaid will take the necessary steps to remain in full compliance.

H.R.Rep. No. 1167, 96th Cong., 2d Sess. 89–90, *reprinted in* [1980] *U.S.Code Cong. & Ad.News* 5526, 5603 (emphasis added).

In the House Report's section-by-section analysis of the Omnibus Act, there is persuasive evidence that Congress intended the amended conditional waiver provision to apply only to reductions for the four 1977 calendar quarters:

> Section 337 amends Section 1903(g)(3)(B) of the Social Security Act [42 U.S.C. § 1396b(g)(3)(B) ] to provide that the Secretary shall waive application of *penalties* for unsatisfactory utilization review showings under Medicaid *for any calendar quarter of 1977* if the Secretary determines a satisfactory showing was made in any calendar quarter of 1978. It modifies the current law which provides that if the State is in compliance for the calendar quarter ending December 31, 1977 the Secretary shall waive *penalties for the first three quarters occurring in 1977.*

*Id.* at 120, *reprinted in* [1980] *U.S.Code Cong. & Ad.News* at 5633 (emphasis added). That is a clear expression by the House Committee that the amended conditional waiver provision is to be applied to penalties "*for* any calendar quarter of 1977," and that the original waiver provision applied to penalties "*for* the first three quarters occurring in 1977." *Id.* (emphasis added). Accordingly, it is reasonable to conclude that

---

**25.** As discussed *supra* at n. 15, HHS did waive the penalties previously imposed for the four

1977 calendar quarters, and amended the disallowance from $10,909,718 to $2,881,309.

the words "with respect to" mean "for," and that the amended conditional waiver provision only permitted the Secretary to waive reductions imposed *"for* a calendar quarter ending after January 1, 1977, and before January 1, 1978."

■ Based on this legislative history,[26] and according some deference to the Secretary's interpretation of his agency's governing statute, *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981), the court adopts the Secretary's view of § 1396b(g)(3)(B) and holds that the 1980 amendment to that section did not authorize the Secretary to waive the derivative reductions imposed for the first two calendar quarters of 1978.[27]

■ Additional support for the Secretary's interpretation of this provision in the Reconciliation Act is found in the maxim that statutes granting exceptions from clearly articulated public policy obligations should be construed narrowly. *Edward R. Marks Music Corp. v. Colorado Magnetics, Inc.,* 497 F.2d 285, 288 (10th Cir.1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975). The purposes of requiring an effective program of utilization control are the protection of public funds and the assurance that the benefits will go to those with appropriate needs. If Congress had concluded that Colorado were to be pardoned for inadequate performance of the inspections required for such purposes, it could easily have said so simply by directing waiver of penalties with respect to all calendar quarters ending after January 1,

1977 and before January 1, 1979. Such a full pardon was not provided in the amendment.

Simply summarized, the larger reduction in this case resulted from the fact that Colorado misrepresented the annual reviews which it performed in the first three quarters of 1977 and failed to take advantage of the opportunity to conduct new reviews within the time provided by a compassionate Congress.

In its desperation to recover the federal funds, Colorado has made the following procedural challenges to the Secretary's imposition of the larger disallowance: 1) inadequate and untimely notice to the state of the reduction for the first calendar quarter of 1978; 2) failure to comply with substantive rule-making procedures in the issuance of certain Action Transmittals (ATs); and 3) failure to perform validation surveys as a condition precedent to imposing the reductions for the first two calendar quarters of 1978. The Board of Grant Appeals rejected each of these challenges, and so does this court.

■ Colorado received from HHS two notices of the disallowances imposed for the last calendar quarter of 1977 and the first calendar quarter of 1978. The Secretary sent Governor Lamm an unofficial notice, dated December 29, 1978, informing the state of the disallowance for all four 1977 calendar quarters and the first two calendar quarters of 1978. On January 22, 1979, HHS sent Colorado a lengthy, official notice of the disallowance, setting out the precise

26. No Senate Report was submitted with the Omnibus Reconciliation Act of 1980. There being no Senate amendment to the waiver provision, the conference agreement included the House provision. H.Conf.Rep. No. 1479, 96th Cong., 2d Sess. 152, *reprinted in* [1980] *U.S. Code Cong. & Ad.News* 5903, 5942. During the Senate's consideration of the conference agreement, the conditional waiver provision was not discussed except insofar as it was summarized by Senator Long, Chairman of the Senate Finance Committee:

The bill prohibits the Secretary from assessing financial penalties against the States for failure to meet the requirements of medicaid law regarding utilization review of long-term

services in institutional settings *for periods prior to January, 1978.*
126 Cong.Rec. S15343 (Dec. 3, 1980) (emphasis added). This summary is consistent with the Secretary's reading of the provision.

27. Colorado's alternative argument that the amended conditional waiver provision somehow evinces a legislative intent to absolve the state of all previously imposed penalties, including those which together comprise the larger disallowance, must fail too. As discussed above, the House Committee Report's discussion of the 1980 amendment does not support this contention.

reasons for the agency's action.[28] Colorado claims that the earlier letter to the Governor was timely under 42 U.S.C. § 1396b(g)(3)(A)(iv),[29] but inadequate under 45 C.F.R. § 16.91,[30] because it failed to set forth the reasons for the disallowance in sufficient detail for the state to respond. The state claims that the official notice adequately set out the reasons for the disallowance, but was untimely because it was dated after January 1, 1979.

There are no cases interpreting these provisions and their interplay. In its decision upholding the Secretary's separate compliance with the timeliness requirement of 42 U.S.C. § 1396b(g)(3)(A)(iv) and the content requirement of 45 C.F.R. § 16.91, the Board looked to what it perceived as the purposes beyond each requirement.

> There is no requirement that one document meet the purposes and requirements of both provisions. The purpose of the statutory provision [42 U.S.C. § 1396b(g)(3)(A)(iv) ], which is to ensure that the State not be subjected to uncertainty as to whether a reduction will be imposed, was met by the first notice. The second notice was the one which triggered the running of the time period for appeal to the Board. The purpose of 45 C.F.R. § 16.91, which is to enable the grantee to respond to a disallowance, was

met by the second notice, which was very complete.[31]

The court finds the reasoning of the Board on this matter persuasive. Moreover, Colorado has failed to show any prejudice due to the Secretary's issuance of separate notices. Section 706 of the APA, which governs judicial review of agency compliance with administrative procedures, expressly provides that "due account shall be taken of the rule of prejudicial error." See McCulloch Interstate Gas Corp. v. Federal Power Commission, 536 F.2d 910, 913 (10th Cir.1976).

■ Colorado claims that certain Action Transmittals (ATs)[32] relevant to the Secretary's assessment of the larger disallowance were substantive rules under the APA, that the Secretary should have complied with the APA's procedures for substantive rulemaking, and that because the Secretary failed to observe those procedures Colorado is not bound by those ATs. This argument is wholly without merit. The ATs challenged by the state are simply interpretive rules which are specifically exempt from the notice and hearing requirements of the APA. 5 U.S.C. § 553(b)(A). Cf. Seniors United for Action v. Ray, 529 F.Supp. 55, 60 n. 2 (N.D.Iowa 1981) ("An Action Transmittal is an interpretive publication by the Department of Health, Education and Wel-

---

28. (Record, app. A, tab I, exh. 1, 2).

29. Section 1396b(g)(3)(A)(iv) provides:
(3)(A) No reduction in the Federal medical Assistance percentage of a State otherwise required to be imposed under this subsection shall take effect—

. . . . .

(iv) due to the State's unsatisfactory or invalid showing made with respect to a calendar quarter beginning after September 30, 1977, unless notice of such reduction has been provided to the State no later than the first day of the fourth calendar quarter following the calendar quarter with respect to which such showing was made.

30. 45 C.F.R. Part 16, including § 16.91, was revised on August 31, 1981. See n. 22, supra. The current regulation prescribing the requirements for disallowance notices is at 45 C.F.R. § 74.304 (1981). However, § 16.91 applies to the disallowances under consideration here. That section provides:

. . . [T]he Board shall have jurisdiction over any disallowance described in § 16.90. That disallowance may not be reviewed by the Board unless the head of the constituent agency or someone he has designated in writing for that purpose has notified the grantee in writing of such disallowance. The notification shall set forth the reasons for the disallowance in sufficient detail to enable the grantee to respond and shall inform the grantee of this opportunity for review under this part.

31. Decision, Departmental Grant Appeals Board at 16–17 (citations to legislative history omitted). (Record, app. A, tab A).

32. SRS–AT–76–88 (June 3, 1976); SRS–AT–76–155 (Oct. 1, 1976); HCFA–AT–77–91 (Sept. 20, 1977); and HCFA–AT–77–106 (Nov. 11, 1977).

fare Health Care Financing Administration."), *aff'd on other grounds,* 635 F.2d 746 (8th Cir.1980), and 675 F.2d 186 (8th Cir. 1982). Rather than creating law, the challenged ATs merely constitute administrative interpretations of law, specifically the quarterly showing format required under 42 U.S.C. § 1396b(g)(1) and the conditional waiver provision enacted in 1977 as § 1396b(g)(3)(B).[33]

■ The state's final procedural challenge to the Secretary's assessment of the larger disallowance is that HHS failed to conduct validation surveys as a condition precedent to taking disallowances for the first two calendar quarters of 1978. First, it must be emphasized that HHS did in fact conduct validation surveys for each of the two quarters involved. For the quarter ending March 31, 1978, it surveyed 20 intermediate care facilities to validate the state's compliance with the physician certification and plan of care requirements of 42 U.S.C. § 1396b(g)(1)(A) and (B).[34] That validation survey resulted in the smaller disallowance at issue in this case. For the quarter ending June 30, 1978, HHS conducted a survey of all levels of long-term care to validate compliance with the annual review requirement of § 1396b(g)(1)(D).[35]

Colorado argues for an unduly strict interpretation of the validation requirement. Section 1396b(g)(2) requires "timely sample onsite surveys of private and public institutions . . ." This does *not* require, as Colorado suggests, the agency to conduct its survey at the various institutions which are the subjects of the survey. It was adequate for HHS to send its surveyors to the offices of the Colorado Department of Health, where they had access to the documents upon which the state had based its paper showings of an effective utilization control program for the quarters in question. Nor does § 1396b(g)(2) require HHS to "re-invalidate" Colorado's reviews of facilities

which the agency had invalidated in surveys for prior calendar quarters. It was appropriate and administratively efficient for the agency to invalidate the state's showings for the first two calendar quarters of 1978, because the showings relied in part on reviews performed in certain facilities prior to October 1, 1977, and HHS had determined already (in its validation survey for the quarter ending on December 31, 1977) that those reviews were inadequate.

Colorado has not met its burden of proof in this review of the Secretary's assessment of the larger disallowance and the Board's affirmance of that action. The Secretary's action was proper under the statute. His interpretation of the annual review requirement follows from the plain language of the statute itself, and his interpretation of the conditional waiver provision is consistent with the statutory scheme and with the legislative history of that provision in particular. None of Colorado's procedural objections to the Secretary's action has merit, and therefore, none constitutes an independent ground for reversal of the disallowance or the Board decision upholding the disallowance.

### Review of the Smaller Disallowance

Colorado asserts that the Secretary committed several errors in his interpretation of and implementation of 42 U.S.C. § 1396b(g)(1)(A), regarding physician certification, and that those errors require the court to reverse the Board decision upholding the smaller disallowance. Specifically, the state contends that the Secretary's equation of the statutory language "time of admission" with "date of admission" was arbitrary and capricious; that his refusal to permit a slight deviation from the requirement of certification "at the time of admission" was arbitrary, capricious and an abuse of discretion; that the Secretary's interpre-

---

**33.** The court notes the inconsistency of the state's position that it should not be bound by these ATs and its claim, discussed *infra,* that it relied on these transmittals and therefore HHS should be estopped from imposing the larger disallowance.

**34.** HCFA–AT–78–37 (April 17, 1978). (Record, app. B, tab G, exh. B).

**35.** HCFA–AT–78–71 (July 26, 1978). (Record, app. A, tab C, exh. 1).

tation of § 1396b(g)(1)(A) as applying to all patients, regardless of their length of stay, was arbitrary and capricious; that the Secretary's refusal to waive or modify the statutory penalty to a more reasonable amount was arbitrary, capricious and an abuse of discretion; and that SRS–AT–75–122, interpreting the requirements of a state's showing under § 1396b(g)(1)(A), is a substantive rule which HHS promulgated without the requisite notice and hearing.

The Board upheld the smaller disallowance against these claims by Colorado. This court concurs in the Board's decision and affirms the Secretary's action.

■ Section 1396b(g)(1)(A) provides that the state's showing of an effective utilization control program must include evidence that:

> in each case for which payment is made under the State plan, a physician certifies at the time of admission, or, if later, the time the individual applies for medical assistance under the State plan ... that such services are or were required to be given on an inpatient basis because the individual needs or needed such services. . . .

The Secretary's interpretation of "time of admission" as meaning "date of admission" is not arbitrary and capricious. It is reasonable for HHS to define precisely when certifications must occur, to aid in the uniform administration of the utilization control program requirements. Moreover, HHS had informed the states, including Colorado, of its interpretation of the specific requirements of § 1396b(g)(1)(A), through AT 75–122, which states that "[c]ertification is the process by which a physician attests to an individual's need for a specific level of institutional care *not later than the date of admission* ..." [36] Col-

orado points to the use of the past tense in § 1396b(g)(1)(A) as evidence that Congress expected some physician certifications to occur after the patient's date of admission. Congress certainly contemplated the situation where an already admitted patient applies for medical assistance at some "later" date; but this situation is distinct from that of the patient who applies for assistance prior to or at the time of admission, but is not certified until some later date, like the recipient who was not certified timely in this case. ·

It was not arbitrary or capricious for HHS to adhere strictly to its requirement that physician certifications occur on or before the date of admission. This policy was communicated to the states through AT 75–122, and there is no evidence that it was implemented in a discriminatory way. Indeed, to waive the requirement simply because a one-day delay in certification is a minor one would all but negate the legitimate purpose behind the policy: to aid in the efficient and uniform administration of the utilization control section.

■ Nor was it arbitrary or capricious for the Secretary to impose the entire penalty of $21,377, computed pursuant to § 1396b(g)(5). The court agrees with Colorado that this was a harsh penalty for so minor a deviation from the utilization control requirements. However, Colorado ignores the mandatory language in which § 1396b(g) is framed, and the absence in the statute of an exception for this type of minor compliance failure. Section 1396b(g) states that the federal funding level "*shall be decreased*" unless the state makes an adequate showing, which "*must* include evidence" that the state has met all utilization requirements, including physician certification "*in each case* for which payment is

---

36. SRS–AT–75–122 (Nov. 13, 1975). (Record, app. B, tab D, attachment A at 1) (emphasis added). Colorado's claim that this AT constitutes a substantive rule under the APA is frivolous. It is labeled "INTERPRETATION" and its contents are summarized as "statements [which] define and clarify what is required in order for States to be considered in adherence with section 250.18(a)(2) [of 45 C.F.R., regard-

ing physician certification]." An examination of those statements reveals that the AT does not make new law or change prior agency rules or policies. Rather, it sets out procedures for implementation of the utilization control program. Such interpretive and procedural pronouncements are specifically exempt from the notice and hearing requirements of the APA. 5 U.S.C. § 553(b)(A).

made." (emphasis added). This language does not provide the Secretary with discretion to waive penalties for noncompliance with the physician certification requirement. That an express provision would be necessary to confer such discretion is evidenced by Congress' decision to include such a provision with respect to the annual review requirement. 42 U.S.C. § 1396b(g)(4)(B).

Additional facts support the court's conclusion that the Secretary's failure to waive or modify the statutory penalty was not arbitrary or capricious. Recognizing the harsh result of applying the statutory formula for computation of the penalty in Colorado's case, the Secretary wrote to the Comptroller General, specifically seeking his opinion as to whether the Secretary could waive or modify the penalty.[37] The Comptroller General concluded that the Secretary had no discretion to waive the disallowance,[38] and the Secretary proceeded accordingly. Such an attempt by the Secretary to avoid imposing the reduction is inconsistent with the state's claim that the penalty was imposed arbitrarily or capriciously. Also, although the penalty of $21,-377 seems high for such a minor deviation from full compliance, it must be remembered that the Secretary performs validation surveys on a random basis and, therefore, it is likely that other acts of noncompliance go undetected and result in no penalty.

■ The state's argument that the "sixty-day" language in 42 U.S.C. § 1396b(g)(1) delays by sixty days the deadline for a physician certification under § 1396b(g)(1)(A) confuses apples and oranges. Section 1396b(g)(1) specifies the number of days (sixty) during which a patient may receive care in an ICF or SNF before reductions under that section can take effect. The sixty-day period is a grace

period of sorts, the expiration of which triggers the Secretary's enforcement of the utilization control requirements. It has nothing to do with the requirements of an effective utilization control program once the sixty day period has elapsed with respect to a particular patient. At that time the enumerated requirements of an effective program, including physician certification, become relevant. For the calendar quarter in question, the state must have submitted a satisfactory and valid showing of an effective program of utilization control for all patients in all long-term care facilities, not simply those patients whose stays have exceeded sixty days (or ninety days in MHs).

Having considered and rejected each of Colorado's arguments against the Secretary's assessment of the smaller disallowance, the court affirms that administrative action and the affirmance by the Board.

### The Estoppel Claim

■ The complaint also contains a plea that the defendant should be estopped from penalizing Colorado for its failure to make up the inadequate medical reviews done in 1977. Colorado claims it relied on a December 6, 1977 letter from the director of HCFA to the director of the Colorado Department of Social Services and a February 21, 1978 memorandum from the acting director of the Medicaid Bureau of HCFA to the acting regional directors of HCFA concerning the applicability of the waiver provisions of Pub.L. 95–142. Those documents are within the administrative record.[39] Nothing within them can be said to be a representation that there was no need to cure the invalid annual surveys made in 1977. Indeed, they are consistent with the position taken by the Secretary. To the extent Colorado is asserting a discrete claim for relief based on the doctrine of estoppel, the claim is insufficient on its face. *Denver Bd. of Water Commissioners v. Bergland,*

---

37. 31 U.S.C. § 74 provides in part that "the head of any executive department ... may apply for and the Comptroller General shall render his decision upon any question involving a payment to be made by [the executive agency] ..."

38. Comp.Gen.Op., File No. B–164031(3).154 (March 4, 1980). (Record, app. B, tab F, exh. 1).

39. (Record, app. A, tab I, exh. 9, 20).

695 F.2d 465 at 482 (10th Cir.1982). Considering the defendant's motion to affirm as a motion to dismiss for failure to state a claim on which relief can be granted, the claim is dismissed.

Upon the foregoing, it is

ORDERED, that the Secretary's decisions are affirmed, the complaint and this civil action are dismissed, and judgment shall enter for the defendant which shall recover its costs on the filing of a bill of costs within ten days.

## APPENDIX

*42 U.S.C. § 1396b.   Payment to States.*

. . . . .

(g) *Decrease in Federal medical assistance percentage.*

(1) Subject to paragraph (3), with respect to amounts paid for the following services furnished under the State plan after June 30, 1973 (other than services furnished pursuant to a contract with a health maintenance organization as defined in section 1876 [42 USC § 1395mm]), the Federal medical assistance percentage shall be decreased as follows: After an individual has received care as an inpatient in a hospital (including an institution for tuberculosis), skilled nursing facility or intermediate care facility on 60 days, or in a hospital for mental diseases on 90 days (whether or not such days are consecutive), during any fiscal year, which for purposes of this section means the four calendar quarters ending with June 30, the Federal medical assistance percentage with respect to amounts paid for any such care furnished thereafter to such individual in the same fiscal year shall be decreased by a per centum thereof (determined under paragraph (5)) unless the State agency responsible for the administration of the plan makes a showing satisfactory to the Secretary that, with respect to each calendar quarter for which the State submits a request for payment at the full Federal medical assistance percentage for amounts paid for inpatient hospital serv-ices (including tuberculosis hospitals), skilled nursing facility services, or intermediate care facility services furnished beyond 60 days (or inpatient mental hospital services furnished beyond 90 days), there is in operation in the State an effective program of control over utilization of such services; such a showing must include evidence that—

(A) in each case for which payment is made under the State plan, a physician certifies at the time of admission, or, if later, the time the individual applies for medical assistance under the State plan (and the physician, or a physician assistant or nurse practitioner under the supervision of a physician recertifies, where such services are furnished over a period of time, in such cases, at least every 60 days (or, in the case of services that are intermediate care facility services described in section 1905(d) [42 U.S.C. § 1396d(d)], every year), and accompanied by such supporting material, appropriate to the case involved, as may be provided in regulations of the Secretary), that such services are or were required to be given on an inpatient basis because the individual needs or needed such services; and

(B) in each such case, such services were furnished under a plan established and periodically reviewed and evaluated by a physician;

(C) such State has in effect a continuous program of review of utilization pursuant to section 1902(a)(30) [42 U.S.C. § 1396a(a)(30)] whereby each admission is reviewed or screened in accordance with criteria established by medical and other professional personnel who are not themselves directly responsible for the care of the patient involved, and who do not have a significant financial interest in any such institution and are not, except in the case of a hospital, employed by the institution providing the care involved; and the information developed from such review or screening, along with the data obtained from prior reviews of the

necessity for admission and continued stay of patients by such professional personnel, shall be used as the basis for establishing the size and composition of the sample of admissions to be subject to review and evaluation by such personnel, and any such sample may be of any size up to 100 per centum of all admissions and must be of sufficient size to serve the purpose of (i) identifying the patterns of care being provided and the changes occurring over time in such patterns so that the need for modification may be ascertained, and (ii) subjecting admissions to early or more extensive review where information indicates that such consideration is warranted; and

(D) such State has an effective program of medical review of the care of patients in mental hospitals, skilled nursing facilities, and intermediate care facilities pursuant to section 1902(a)(26) and (31) [42 U.S.C. § 1396a (a)(26), (31) ] whereby the professional management of each case is reviewed and evaluated at least annually by independent professional review teams.

In determining the number of days on which an individual has received services described in this subsection, there shall not be counted any days with respect to which such individual is entitled to have payments made (in whole or in part) on his behalf under section 1812 [42 U.S.C. § 1395d].

(2) The Secretary shall, as part of his validation procedures under this subsection, conduct timely sample onsite surveys of private and public institutions in which recipients of medical assistance may receive care and services under a State plan approved under this title, and his findings with respect to such surveys (as well as the showings of the State agency required under this subsection) shall be made available for public inspection

(3) (A) No reduction in the Federal medical assistance percentage of a State otherwise required to be imposed under this subsection shall take effect—

(i) if such reduction is due to the State's unsatisfactory or invalid showing made with respect to a calendar quarter beginning before January 1, 1977;

(ii) before January 1, 1978;

(iii) unless a notice of such reduction has been provided to the State at least 30 days before the date such reduction takes effect; or

(iv) due to the State's unsatisfactory or invalid showing made with respect to a calendar quarter beginning after September 30, 1977, unless notice of such reduction has been provided to the State no later than the first day of the fourth calendar quarter following the calendar quarter with respect to which such showing was made.

(B) The Secretary shall waive application of any reduction in the Federal medical assistance percentage of a State otherwise required to be imposed under paragraph (1) because a showing by the State, made under such paragraph with respect to a calendar quarter ending after January 1, 1977, and before January 1, 1978, is determined to be either unsatisfactory under such paragraph or invalid under paragraph (2), if the Secretary determines that the State's showing made under paragraph (1) with respect to any calendar quarter ending on or before December 31, 1978, is satisfactory under such paragraph and is valid under paragraph (2).

(4) (A) The Secretary may not find the showing of a State, with respect to a calendar quarter under paragraph (1), to be satisfactory if the showing is submitted to the Secretary later than the 30th day after the last day of the calendar quarter, unless the State demonstrates to the satisfaction of the Secretary good cause for not meeting such deadline.

(B) The Secretary shall find a showing of a State, with respect to a calendar quarter under paragraph (1), to be satisfactory under such paragraph with respect to the requirement that the State conduct annu-

al onsite inspections in mental hospitals, skilled nursing facilities, and intermediate care facilities under paragraph (26) and (31) of section 1902(a) [42 U.S.C. § 1396a(a)(26) and (31)], if the showing demonstrates that the State has conducted such an onsite inspection during the 12-month period ending on the last date of the calendar quarter—

    (i) in each of not less than 98 per centum of the number of such hospitals and facilities requiring such inspection, and

    (ii) in every such hospital or facility which has 200 or more beds,

and that, with respect to such hospitals and facilities not inspected within such period, the State has exercised good faith and due diligence in attempting to conduct such inspection, or if the State demonstrates to the satisfaction of the Secretary that it would have made such a showing but for failings of a technical nature only.

(5) In the case of a State's unsatisfactory or invalid showing made with respect to a type of facility or institutional services in a calendar quarter, the per centum amount of the reduction of the State's Federal medical assistance percentage for that type of services under paragraph (1) is equal to 33⅓ per centum multiplied by a fraction, the denominator of which is equal to the total number of patients receiving that type of services in that quarter under the State plan in facilities or institutions for which a showing was required to be made under this subsection, and the numerator of which is equal to the number of such patients receiving such type of services in that quarter in those facilities or institutions for which a satisfactory and valid showing was not made for that calendar quarter.

(6) The Secretary shall submit to Congress, not later than sixty days after the end of such calendar quarter, a report on—

    (A) his determination as to whether or not each showing, made under paragraph (1) by a State with respect to the calendar quarter, has been found to be satisfactory under such paragraph;

(B) his review (through onsite surveys and otherwise) under paragraph (2) of the validity of showings previously submitted by a State; and

(C) any reduction in the Federal medical assistance percentage he has imposed on a State because of its submittal under paragraph (1) of an unsatisfactory or invalid showing.